UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK




SUSAN E. COOPER, ELLEN F. PRICE, MARY FLINT PARDI, DAVID B. FLINT and MARILYN A. FLINT, individually and as agents for all former shareholders of Flint Ink Corporation,

Plaintiffs,

vs.

ASTER ZWEITE BETEILIGUNGS GmbH, a company with limited liability incorporated under the laws of the Federal Republic of Germany,

Defendant.

**COMPLAINT FOR BREACH OF CONTRACT**

Plaintiffs Susan E. Cooper, Ellen F. Price, Mary Flint Pardi, David B. Flint and Marilyn A. Flint ("Plaintiffs"), individually and as agents for all of the former shareholders of Flint Ink Corporation (collectively with Plaintiffs, "Shareholders"), by their undersigned attorneys, allege the following in support of their Complaint against Aster Zweite Beteiligungs GmbH ("Defendant"), as assignee of the rights and liabilities of Xsys US, Inc. ("Xsys" or "Purchaser"):

## NATURE OF THE ACTION

1. Plaintiffs bring this action to recover an "earn-out" payment that Defendant owes Shareholders in connection with the purchase of the Flint Ink Corporation ("Flint Ink") by Xsys, Defendant's wholly-owned subsidiary.

2. Flint Ink is one of the world's leading manufacturers and distributors of printing inks and pigments. Flint Ink was founded more than 80 years ago and had evolved by 2005 into a multinational business with operations in over 30 countries and annual revenues in excess of $1.5 billion. In May 2005, Shareholders entered into discussions concerning a sale of Flint Ink

to Xsys, a competitor in the ink manufacturing and distribution business that is owned and controlled by defendant Aster Zweite Beteiligungs GmbH, a German private equity firm. The parties, who were represented by highly sophisticated counsel, negotiated and executed a Stock Purchase Agreement (the "Purchase Agreement") that effected a sale of all the stock of Flint Ink to Xsys.

3. The Purchase Agreement (all rights and obligations of which were assigned by Xsys to the Defendant shortly after closing) and an accompanying Vendor Loan Agreement ("Loan Agreement") require the Defendant to pay Shareholders an aggregate "earn-out" payment of $35,493,089.72, plus interest, but only in the event that Flint Ink achieved an Adjusted 2006 Gross Margin (as such term is defined by the Purchase Agreement) of $76,561,000. If triggered, the earn-out payment would be comprised of: (i) an immediate cash payment of $17,746,544.86, plus accrued interest (such funds having been previously deposited into an interest-bearing escrow account); and (ii) the repayment with interest of a loan, also in the principal amount of $17,746,544.86, which Shareholders had provided the Defendant pursuant to the Loan Agreement.

4. Due to the magnitude of the potential earn-out payment, the parties negotiated, and the Purchase Agreement sets forth, a precise procedure, with strict deadlines, for the calculation and review of the Adjusted 2006 Gross Margin. Section 2.10(a) of the amended Purchase Agreement provides that "[b]y February 15, 2007," Defendant was to provide Shareholders its determination of the Adjusted 2006 Gross Margin. The Purchase Agreement further provides that Shareholders would have 45 days following Defendant's determination of the Adjusted 2006 Gross Margin to investigate the basis of Defendant's calculation and provide notice to Defendant of any disagreement. As set forth in the Purchase Agreement, if

Shareholders advised Defendant that they did not disagree with any amounts reflected in Defendant's calculation or failed to submit a "Notice of Earnout Disagreement" within the 45 days, then Defendant's calculation would be deemed "final and binding upon the parties." Moreover, the Purchase Agreement provides that if the Shareholders submit a "Notice of Earnout Disagreement" within the requisite period, then "only those matters that are specified in such Notice of Earnout Disagreement shall be deemed to be in dispute, and all other matters shall be final and binding on the parties."

5. On February 14, 2007, within the deadline established by the Purchase Agreement, the Defendant tendered to Shareholders its determination of the Adjusted 2006 Gross Margin. According to Defendant, the Adjusted 2006 Gross Margin was $2,283,000 short of the $76,561,000 target amount that would trigger the earn-out payment.

6. Shareholders immediately began an investigation of Defendant's determination. Shareholders determined that the calculation of the Adjusted 2006 Gross Margin that Defendant provided on February 14, 2007 was based on significant accounting errors that improperly depressed the Adjusted 2006 Gross Margin by at least approximately $4 million. Shareholders timely notified Defendant of errors of almost $4 million.

7. Defendant ultimately acknowledged more than $3 million of these errors, rendering upward adjustments in this amount final and binding on the parties and resulting in an Adjusted 2006 Gross Margin in excess of the target amount for the earn-out payments. Rather than pay the Shareholders what it owes them, however, Defendant has sought to avoid its obligations by gamesmanship not permitted by the Purchase Agreement. Long after the deadline for doing so, Defendant sought to alter amounts previously determined by Defendant — and

undisputed by Shareholders — in order to offset the adjustments Defendant was forced to concede in the Shareholders' favor.

8. Thus, on April 24, 2007, more than two months after the February 15, 2007 deadline for Defendant to submit its determination, Defendant notified Shareholders that it was submitting a "revised" Adjusted 2006 Gross Margin figure. Defendant notified Shareholders that, notwithstanding its acknowledgement of upward adjustments of more than $3 million, Shareholders were not entitled to the earn-out payments under the "revised" Adjusted 2006 Gross Margin.

9. Defendant's belated recalculation of the Adjusted 2006 Gross Margin is in clear violation of the Purchase Agreement, which unambiguously, and for good reason, required Defendant to submit its calculation of the figure by February 15, 2007, and prohibits any adjustments to the calculation after that date. Using the amounts provided by Defendant in its Initial Earnout Statement, as adjusted to correct for the matters disputed by Shareholders and conceded by Defendant, the Adjusted 2006 Gross Margin exceeds the target amount for the earn-out payment.

## JURISDICTIONAL ALLEGATIONS

10. Plaintiff Susan E. Cooper is an individual residing in Bloomfield Hills, Michigan.

11. Plaintiff David B. Flint is an individual residing in Palm Beach, Florida.

12. Plaintiff Marilyn A. Flint is an individual residing in Bloomfield Hills, Michigan.

13. Plaintiff Mary Flint Pardi is an individual residing in Bloomfield Hills, Michigan.

14. Plaintiff Ellen F. Price is an individual residing in Telluride, Colorado.

15. Plaintiffs bring this action individually and as agents for all former shareholders of the Company, pursuant to Durable Powers of Attorney executed by said shareholders.

16. Defendant Aster Zweite Beteiligungs GmbH is a limited liability company organized under the laws of the Federal Republic of Germany, and its principal place of business is Stuttgart, Germany.

17. The matter in controversy exceeds $75,000.00.

18. The court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332(a)(2) in that the matter in controversy exceeds the jurisdictional amount exclusive of interest and costs and the controversy is between citizens of several States and a citizen of a foreign state.

19. The court has personal jurisdiction over the Defendant because it has agreed to "submit to the exclusive jurisdiction of any federal or state court sitting in the Borough of Manhattan of the City of New York ... [and to] irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts ... ." Ex. A, p.77, § 12.11.

20. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in this district and the Defendant is subject to personal jurisdiction only in this district with respect to this dispute.

**KEY CONTRACTUAL PROVISIONS**

21. On July 15, 2005, the Shareholders and Purchaser executed the Purchase Agreement. *See* Ex. A. Thereafter, Purchaser raised concerns about the increasing cost of petroleum, a raw material used in many of Flint Ink's manufacturing processes, and sought to

renegotiate the purchase price. On September 29, 2005, the Shareholders and Purchaser executed an Amendment to the Purchase Agreement that, among other things, significantly reduced the purchase price in exchange for a provision requiring Purchaser to make an earn-out payment in the amount of $17,746,544.86 (plus any applicable interest) in the event that the Adjusted 2006 Gross Margin is equal to or greater than the $76,561,000 target amount. *See* Ex. B.

22. In addition, and in further consideration for the reduction in the purchase price, Shareholders and the Defendant executed the Loan Agreement. Pursuant to the Loan Agreement, the Defendant agreed to treat $17,746,544.86 of the reduction in the purchase price as a loan in the same amount by Shareholders to the Defendant. *See* Ex. C, p. 1. Repayment of the loan with interest was contingent upon the triggering of the earn-out provision in the Purchase Agreement. Specifically, the Loan Agreement provides that "only in the event that the Adjusted 2006 Gross Margin equals or exceeds the Target Amount as determined pursuant to Section 2.10(d) of the Stock Purchase Agreement, then [Defendant] shall repay the Loan and interest ...." Ex. C, p.4, §4.1.

23. Section 2.10 of the Purchase Agreement contains a clear and comprehensive procedure for the determination, review, and resolution of any dispute with respect to the Adjusted 2006 Gross Margin. This procedure is the end result of an extensive arm's length negotiation between the Shareholders and the Purchaser. All parties to the Purchase Agreement were represented by highly sophisticated counsel and, upon information and belief, the parties spent in excess of $4 million on legal fees associated with the transaction.

24. Section 2.10(a) of the Purchase Agreement, as amended, provides that ***"[n]o later than February 15, 2007***, the Purchaser shall prepare and deliver to the [Shareholders'] Representatives a statement setting forth the Purchaser's good faith determination of the Adjusted 2006 Gross Margin" Ex B, p.2, § 2.10(a) (emphasis added). This notice is called the "Initial Earnout Statement." At no point after February 15, 2007 was the Purchaser permitted to revise, clarify, adjust or resubmit the figures the Purchaser used to calculate the Adjusted 2006 Gross Margin reflected in the Initial Earnout Statement. Ex. B, p.2, § 2.10(a).

25. Section 2.10(a) further provides that Shareholders and their representatives "shall be permitted to review the records of the Company, the Subsidiaries, and their respective accountants" in order to substantiate or disagree with the calculations forming the basis of the Initial Earnout Statement. The Shareholders had 45 days in which to complete this investigation, during which time the Purchaser was required to "make reasonably available the individuals responsible" for the preparation of Initial Earnout Statement. Ex. B, p.2, § 2.10(a).

26. By the conclusion of the 45-day investigation period, Shareholders were required to deliver a Notice of Earnout Disagreement specifically setting forth any disagreements relating to "any amounts reflected on the Initial Earnout Statement." The Initial Earnout Statement was to become "final and binding upon the parties" if the Shareholders fail to timely deliver a Notice of Earnout Disagreement. Ex. B, p.3, §2.10(b).

27. Once a Notice of Earnout Disagreement has been timely submitted, only those matters specified in the Notice of Earnout Disagreement "shall be deemed to be in dispute, ***and all other matters shall be final and binding upon the parties***" Ex. B, p.3, §2.10(b) (emphasis added).

28. During the 30-day period following Shareholders' timely submission of a Notice of Earnout Disagreement, the Shareholders and the Purchaser "shall seek to resolve any differences that they may have ***with respect to any matter specified in the Notice of Earnout Disagreement***, and any resolution by them ***as to any such matter*** shall be final and binding on the parties." Ex. B, p.3, §2.10(c) (emphasis added). If the parties are unable to agree in the 30-day period on "all matters specified in the Notice of Earnout Disagreement," then either party may submit to a pre-selected, independent third party for resolution of "any and all matters specified in the Notice of Earnout Disagreement that remain in dispute." *Id.* (emphasis added). After resolution of any such matters, the third party shall issue a binding "Final Earnout Statement." *Id.*

**DEFENDANT'S LACK OF COMPLIANCE**

29. On February 14, 2007, Defendant timely submitted its Initial Earnout Statement, declaring that the "Purchaser's good faith determination of the Adjusted 2006 Gross Margin is $74,278,000." Ex. D.

30. The Shareholders engaged the financial consulting firm of Conway, MacKenzie & Dunleavy to analyze the records of Flint Ink in order to determine whether the amounts reflected in the Initial Earnout Statement were accurate.

31. Between March 5, 2007 (the first date upon which Defendant provided requested documents to the Shareholders' representatives) and March 30, 2007, Conway, MacKenzie & Dunleavy analyzed Flint Ink's books and records (to the extent they were provided) in order to determine the accuracy of the Initial Earnout Statement.

32. On March 30, 2007, the Shareholders timely delivered to the Defendant a Notice of Earnout Disagreement, which claimed the Adjusted 2006 Gross Margin to be $78,216,000. Ex. E. Specifically, the Notice of Earnout Disagreement set forth five matters as to which the Shareholders disagreed:

1) Estimate of change in transfer pricing methodology for Sheetfield ($830,000);

2) Change in output transfer pricing methodology for Sheetfield ($12,000);

3) Impact of freight surcharge from CDR ($2,012,000)

4) CDR R&D costs which should have been included in the sales matrix ($1,040,000); and

5) Stock count adjustment ($44,000).

The Notice of Earnout Disagreement disclosed that these five matters were the only matters in dispute. Taken together, these five matters resulted in a $3,938,000 disparity between the Adjusted 2006 Gross Margin as calculated by Defendant and Shareholders. Ex. E.

33. On or about April 24, 2007, Defendant responded to the Notice of Earnout Disagreement. Ex. F. In its response, Defendant acknowledged that $3,035,000 of the line items that Shareholders had disputed, as set forth in Shareholders' Notice of Earnout Disagreement, had been resolved in Shareholders' favor. Ex. F, p. 3, ¶¶ 4-5. In an attempt to avoid the earn-out payment, however, Defendant asserted that the Adjusted 2006 Gross Margin figure provided in its Initial Earnout Statement was only "preliminary," and Defendant sought to revise it. Ex. F, p. 2.

34. Specifically, Defendant acknowledged that the $2,012,000 adjustment that it had made for "Impact of freight surcharge from CDR" in its Initial Earnout Statement calculation of the Adjusted 2006 Gross Margin (and which Shareholders disputed in the Notice of Earnout Disagreement) was incorrect and that the proper adjustment should have only been $17,000. Accordingly, the Adjusted 2006 Gross Margin calculation was understated by $1,995,000 as a result of this error. Ex. F, p.3, ¶ 4.

35. In addition, Defendant acknowledged that the $1,040,000 adjustment that it had made for "CDR R&D costs which should be included in the sales matrix" in its Initial Earnout Statement calculation of the Adjusted 2006 Gross Margin (and which Shareholders disputed in the Notice of Earnout Disagreement) was incorrect and that there should have been no adjustment made for that category. Accordingly, the Adjusted 2006 Gross Margin calculation was understated by an additional $1,040,000 as a result of this error. Ex. F, p.3, ¶ 5.

36. Using the amounts provided by Defendant in its Initial Earnout Statement, as adjusted to correct for the matters disputed by Shareholders and conceded by Defendant, the Adjusted 2006 Gross Margin exceeds the target amount for the earn-out payment.

37. Realizing that the Adjusted 2006 Gross Margin now exceeded the target amount for the earn-out payment, Defendant sought to revise other figures that formed the basis of its Initial Earnout Statement — even though Shareholders did not dispute those figures in their Notice of Earnout Disagreement — in order to offset the adjustments required to be made in relation to the matters disputed by Shareholders. Indeed, Defendant sought to adjust other matters in amounts that almost perfectly offset the upward adjustment of $3,035,000 required to correct for Defendant's prior errors. Thus, Defendant claimed that, after the deadline of

February 15, 2007, it identified $3,065,000 of additional downward adjustments to the Adjusted 2006 Gross Margin — adjustments that are only $30,000 different from the upward adjustments required to correct the matters disputed by the Shareholders and conceded by the Defendant. Due to its purported "recalculation," Defendant refuses to pay the earn-out payment it owes Shareholders.

38. Attached as Ex. G is a table setting forth the matters and amounts that the Shareholders disputed in their Notice of Earnout Disagreement, the matters and amounts that Defendant conceded were resolved in Shareholders' favor, and the corrected calculation of the Adjusted 2006 Gross Margin, which exceeds the target amount.

## COUNT I

## BREACH OF CONTRACT

39. Plaintiffs re-allege Paragraphs 1 through 38 as though each were fully set forth herein.

40. The Purchase Agreement, as amended, constitutes a valid and binding contract between Shareholders and Purchaser.

41. Purchaser assigned all its rights and obligations under the Purchase Agreement to Defendant.

42. The Loan Agreement constitutes a valid and binding contract between the Shareholders and Defendant.

43. Shareholders have complied with and will continue to comply with and satisfy all of their obligations under the Purchase Agreement and the Loan Agreement.

44. In violation of Section 2.10(a) of the Purchase Agreement, Defendant seeks to revise, clarify, adjust, and resubmit the amounts that it used to calculate the Adjusted 2006 Gross Margin reflected in its Initial Earnout Statement, dated February 14, 2007.

45. Using the amounts provided by Defendant in its Initial Earnout Statement, as adjusted to correct for the matters disputed by Shareholders and conceded by Defendant, the Adjusted 2006 Gross Margin exceeds the target amount for the earn-out payment.

46. Consequently, the Initial Earnout Statement, as corrected, is final and binding on the parties, requiring the Defendant to cause the Earnout Fund (as defined by the Purchase Agreement) to be distributed to Shareholders' Representatives pursuant to Section 2.10(d) of the Purchase Agreement, as amended. Ex. B, pp. 3-4, §2.10(d).

47. In addition, the Shareholders are entitled to repayment of the loan pursuant to the payment schedule set forth in the Loan Agreement. Ex. C, p.4, §4.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment in their favor and against Defendant in an amount in excess of $75,000.00 plus interest, costs and attorney fees, order the Defendant to distribute the Earnout Fund to the Shareholders' Representatives and repay Shareholders the loan according to the repayment procedure set forth in the Loan Agreement, and award such other relief that the Court deems just and equitable.

Dated: New York, NY
August 30, 2007

MILBANK, TWEED, HADLEY & McCLOY LLP

George S. Canellos
Kevin M. Ashby
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

-and-

Ira J. Jaffe
Michael F. Jacobson
Kevin B. Hirsch
Jaffe, Raitt, Heuer & Weiss,
Professional Corporation
Suite 2500
27777 Franklin Road
Southfield, Michigan 48034
(248) 351-3000

*Co-counsel for Plaintiffs*