# EXHIBIT A

**CONFIDENTIAL**

---

STOCK PURCHASE AGREEMENT

---

Among

THE SHAREHOLDERS OF FLINT INK CORPORATION

and

Xsys US Inc.

Dated as of July 15, 2005

NYDOCS02/727187 13

## TABLE OF CONTENTS

Page

### ARTICLE I

#### DEFINITIONS

SECTION 1.01. Certain Defined Terms .................................................................... 2
SECTION 1.02. Definitions ...................................................................................... 13
SECTION 1.03. Interpretation and Rules of Construction ........................................ 15

### ARTICLE II

#### PURCHASE AND SALE

SECTION 2.01. Purchase and Sale of the Shares ...................................................... 16
SECTION 2.02. Purchase Price ................................................................................. 16
SECTION 2.03. Closing ............................................................................................ 16
SECTION 2.04. Closing Deliveries by the Sellers .................................................... 16
SECTION 2.05. Closing Deliveries by the Purchaser ................................................ 17
SECTION 2.06. Equity Gain Share Plan ................................................................... 18
SECTION 2.07. Purchase Price Adjustment .............................................................. 18
SECTION 2.08. Escrow ............................................................................................. 22
SECTION 2.09. Sellers' Representatives ................................................................... 22

### ARTICLE III

#### REPRESENTATIONS AND WARRANTIES
#### OF THE SELLERS

SECTION 3.01. Organization and Authority of the Sellers ....................................... 23
SECTION 3.02. Governmental Consents and Approvals ........................................... 23
SECTION 3.03. No Conflict ...................................................................................... 24
SECTION 3.04. Ownership of Shares ........................................................................ 24
SECTION 3.05. Litigation ......................................................................................... 24
SECTION 3.06. Financing .......................................................................................... 24

### ARTICLE IV

#### REPRESENTATIONS AND WARRANTIES
#### ABOUT THE COMPANY AND THE SUBSIDIARIES

SECTION 4.01. Organization, Authority and Qualification of the Company and the
Subsidiaries ................................................................................... 24
SECTION 4.02. Capitalization .................................................................................... 25
SECTION 4.03. No Conflict ....................................................................................... 26

SECTION 4.04. Governmental Consents and Approvals. ............................................. 26
SECTION 4.05. Financial Information. ......................................................................... 27
SECTION 4.06. Absence of Undisclosed Material Liabilities ...................................... 27
SECTION 4.07. Conduct in the Ordinary Course .......................................................... 28
SECTION 4.08. Litigation ............................................................................................ 28
SECTION 4.09. Compliance with Laws ....................................................................... 28
SECTION 4.10. Environmental Matters ....................................................................... 28
SECTION 4.11. Intellectual Property ........................................................................... 29
SECTION 4.12. Real Property ....................................................................................... 30
SECTION 4.13. Employee Benefit Matters .................................................................. 31
SECTION 4.14. Taxes ................................................................................................... 35
SECTION 4.15. Material Contracts .............................................................................. 35
SECTION 4.16. Affiliate Contracts .............................................................................. 37
SECTION 4.17. Risk Management Instruments ............................................................ 37
SECTION 4.18. Collective Bargaining; Labor Disputes .............................................. 38
SECTION 4.19. Assets .................................................................................................. 38
SECTION 4.20. Business Practices ............................................................................... 38
SECTION 4.21. Insurance ............................................................................................. 38
SECTION 4.22. Personal Property ................................................................................ 39
SECTION 4.23. Customer and Suppliers ...................................................................... 39
SECTION 4.24. Product Warranties and Liabilities ..................................................... 39
SECTION 4.25. Accounts Receivable ........................................................................... 39
SECTION 4.26. Brokers ................................................................................................ 40
SECTION 4.27. Disclaimer of the Sellers .................................................................... 40
SECTION 4.28. Financing ............................................................................................. 40

ARTICLE V

REPRESENTATIONS AND WARRANTIES
OF THE PURCHASER

SECTION 5.01. Organization and Authority of the Purchaser ...................................... 41
SECTION 5.02. No Conflict .......................................................................................... 41
SECTION 5.03. Governmental Consents and Approvals .............................................. 41
SECTION 5.04. Investment Purpose ............................................................................. 42
SECTION 5.05. Financing ............................................................................................. 42
SECTION 5.06. Litigation ............................................................................................. 43
SECTION 5.07. Brokers ................................................................................................ 43
SECTION 5.08. Independent Investigation; Sellers' Representations .......................... 43

ARTICLE VI

ADDITIONAL AGREEMENTS

SECTION 6.01. Conduct of Business Prior to the Closing ........................................... 43
SECTION 6.02. Access to Information .......................................................................... 46
SECTION 6.03. Confidentiality ..................................................................................... 47

SECTION 6.04. Regulatory and Other Authorizations; Notices and Consents ............ 48
SECTION 6.05. Names and Marks. ............................................ 49
SECTION 6.06. Notifications ................................................ 49
SECTION 6.07. Equity Gain Share Plan ........................................ 50
SECTION 6.08. Capital Accumulation Plan and Trust ............................ 50
SECTION 6.09. Further Action ............................................... 50
SECTION 6.10. Non-Competition; Non-Solicitation .............................. 51
SECTION 6.11. Transactions with Affiliates ................................... 52
SECTION 6.12. Directors' and Officers' Indemnification and Insurance ............ 53
SECTION 6.13. Exclusivity .................................................. 54
SECTION 6.14. Credit Facilities ............................................. 54
SECTION 6.15. Cash Management ............................................. 55
SECTION 6.16. Financing .................................................... 55

ARTICLE VII

EMPLOYEE MATTERS

SECTION 7.01. Continuation of Benefits ...................................... 55

ARTICLE VIII

TAX MATTERS

SECTION 8.01. Tax Indemnities .............................................. 57
SECTION 8.02. Tax Refunds and Tax Benefits .................................. 58
SECTION 8.03. Contests ..................................................... 59
SECTION 8.04. Preparation of Tax Returns .................................... 60
SECTION 8.05. Tax Cooperation and Exchange of Information .................... 60
SECTION 8.06. Conveyance Taxes ............................................ 61
SECTION 8.07. Tax Covenants ............................................... 61
SECTION 8.08. Miscellaneous ................................................ 61

ARTICLE IX

CONDITIONS TO CLOSING

SECTION 9.01. Conditions to Obligations of the Sellers ........................ 62
SECTION 9.02. Conditions to Obligations of the Purchaser ...................... 63

ARTICLE X

INDEMNIFICATION

SECTION 10.01. Survival of Representations and Warranties ..................... 64
SECTION 10.02. Indemnification by the Sellers ................................ 65
SECTION 10.03. Indemnification by the Purchaser ............................. 66
SECTION 10.04. Limits on Indemnification .................................... 66

SECTION 10.05. Notice of Loss; Third Party Claims ............................................. 69
SECTION 10.06. Remedies ..................................................................................... 71
SECTION 10.07. Tax Matters ................................................................................. 72
SECTION 10.08. Additional Environmental Provisions ........................................ 72

### ARTICLE XI

### TERMINATION, AMENDMENT AND WAIVER

SECTION 11.01. Termination .................................................................................. 73
SECTION 11.02. Effect of Termination .................................................................. 74

### ARTICLE XII

### GENERAL PROVISIONS

SECTION 12.01. Expenses ...................................................................................... 74
SECTION 12.02. Notices ......................................................................................... 74
SECTION 12.03. Public Announcements ............................................................... 76
SECTION 12.04. Severability ................................................................................. 76
SECTION 12.05. Entire Agreement ........................................................................ 76
SECTION 12.06. Assignment ................................................................................. 76
SECTION 12.07. Amendment ................................................................................. 77
SECTION 12.08. Waiver ......................................................................................... 77
SECTION 12.09. No Third Party Beneficiaries ..................................................... 77
SECTION 12.10. Currency ...................................................................................... 77
SECTION 12.11. Governing Law ........................................................................... 77
SECTION 12.12. Waiver of Jury Trial .................................................................... 78
SECTION 12.13. Counterparts ................................................................................ 78
SECTION 12.14. Specific Performance .................................................................. 78
SECTION 12.15. Waiver and Release ..................................................................... 78

EXHIBITS

1.01(a)        Accounting Principles

1.01(b)        Calculation of Closing Date Net Proceeds to Equity Holders and Sellers

1.01(c)        Company's Knowledge

1.01(d)        Credit Facilities

1.01(e)        EBITDA Calculation

1.01(f)        Amended Lease Terms

1.01(g)        Purchaser's Knowledge

2.08           Form of Escrow Agreement

5.05(a)        Financing Conditions

5.05(c)        Guarantor's Balance Sheet

ANNEXES

ANNEX I      SHAREHOLDERS OF THE COMPANY

ANNEX II     FORM OF EUROPEAN ACQUISITION AGREEMENT

ANNEX III    FORM OF DUTCH ACQUISITION AGREEMENT

ANNEX IV     FORM OF GERMAN I ACQUISITION AGREEMENT

ANNEX V      FORM OF DANISH ACQUISITION AGREEMENT

ANNEX VI     GERMAN II ACQUISITION AGREEMENT

ANNEX VII    FORM OF GUARANTOR'S GUARANTY

STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of July 15, 2005, among the shareholders set forth on Annex I hereto (the "Sellers") and Xsys US Inc., a Michigan corporation (the "Purchaser")

WHEREAS, the Sellers own all of the issued and outstanding shares (the "Shares") of common stock, no par value per share (the "Common Stock"), of Flint Ink Corporation, a Michigan corporation (the "Company");

WHEREAS, the Company and the Subsidiaries are engaged in the global business of (i) researching, developing and producing liquid and paste ink for use in commercial printing, publication printing and packaging printing, pigments, and specialty inks for scented, metallic, aqueous and other applications; (ii) selling and distributing inks and related products and services to customers worldwide, for use in commercial printing, publication printing and packaging printing; and (iii) the businesses conducted by the EBUs (collectively, the "Business");

WHEREAS, immediately prior to the subsequent consummation of the acquisition by the Purchaser of the Shares from the Sellers, the parties desire to cause the following transactions to take place in the following order: the Company and Arrowhead European Investments LLC will transfer all of their interests in Flint Ink Europe to Arrowhead Investments (UK) Limited pursuant to the terms of an agreement substantially in the form attached as Annex II hereto (the "European Acquisition Agreement"); Flint Ink (UK) Limited ("Flint Ink UK") will sell all of the outstanding shares of Flint Ink Nederland B.V. to ANI Printing Ink B.V. pursuant to the terms of an agreement substantially in the form attached as Annex III hereto (the "Dutch Acquisition Agreement"); Arrowhead Holdings Spain S.L. ("AHS Spain S.L.") will sell its 73.656% partnership interest in Flint-Schmidt JV (as defined herein) and 5.1% of the shares of Druckfarbenfabrik Gebr. Schmidt GmbH Frankfurt a.M.–Rodelheim to Aster Zweite Beteiligungs GmbH ("AZB") pursuant to the terms of an agreement substantially in the form attached as Annex IV hereto (the "German I Acquisition Agreement"); AHS Spain S.L. will sell 5.1% of the shares of Arrowhead Holdings Denmark ApS to AZB pursuant to the terms of an agreement substantially in the form attached as Annex V hereto (the "Danish Acquisition Agreement"); and the Families (as defined herein) will sell their 26.344% partnership interest in Flint-Schmidt JV to AZB pursuant to the terms of the agreement attached as Annex VI hereto (the "German II Acquisition Agreement"); and

WHEREAS, the Sellers wish to sell to the Purchaser, and the Purchaser wishes to purchase from the Sellers, the Shares, all upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and the mutual representations, warranties, agreements and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Sellers and the Purchaser hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1 01    Certain Defined Terms.  For purposes of this Agreement:

"Accounting Principles" means the accounting principles set forth in Exhibit 1.01(a) hereto

"Action" means any claim, action, suit, arbitration, inquiry, indictment, demand, hearing, proceeding or investigation by or before any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Ancillary Agreements" means the European Acquisition Agreement, the Dutch Acquisition Agreement, the Danish Acquisition Agreement, the Escrow Agreement, the German I Acquisition Agreement, the Guarantor Guaranty, the Headquarters Lease Agreement and the Research Facility Lease Agreement.

"Applicable Percentage" means, with respect to each Seller, the percentage set forth on Annex I hereto with respect to such Seller.

"Assets" means the assets and properties of the Company and the Subsidiaries.

"Base Amount" means $985,742,000 (equivalent to $1,080,000,000 less specified deductions negotiated by the parties of $94,258,000 in the aggregate).

"Books and Records" means all books, records, manuals, financial records for each account, documents and files (other than any Tax Returns or other Tax records) related to the conduct of the Business in paper, electronic or other form in which they are maintained by the Sellers, the Company and the Subsidiaries.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in The City of New York or Ann Arbor, Michigan.

"Buy-Sell Agreement" means the Flint Ink Corporation Stock Purchase Agreement, effective as of December 30, 1977 and as subsequently amended through December 31, 2002, among the Company, Flint Ink International Sales Corporation, a Michigan corporation ("Sales Corp"), and the Sellers.

"Buy-Sell Agreement Letter" means the letter agreement, dated as of the date hereof, among the Sellers, the Company and Sales Corp.

"Capital Accumulation Plan Amount" means any amount payable or that may become payable in connection with the termination and settlement of obligations under the Company's Capital Accumulation Plan.

"Cash" means, for the Company and the Subsidiaries, as of the Closing, cash and cash equivalents that would be set forth on an audited balance sheet dated as of the Closing Date determined in accordance with GAAP and applied on a basis consistent with practices used in preparing the Audited Financial Statements, excluding for all purposes (i) any of the preceding items that may not, as of the Closing, be distributed or paid to any Affiliate (including the Purchaser) pursuant to applicable Law, Contracts or other form of legal restriction or limitation (other than (a) any cash to the extent it could be used to repay any Debt Obligations or to pay any accounts payable, in each case whether or not then existing, in the Ordinary Course of Business in the country in which it is held or (b) any limitations solely related to withholding or other Taxes in the event of the distribution of such cash) and (ii) the Pre-Closing Transactions Consideration received by the Company or its Subsidiaries.

"Closing Date Net Proceeds to EGS Holders" means an amount equal to the aggregate Cumulative Gain (as defined in the Equity Gain Share Plan) multiplied by the number of Equity Gain Shares outstanding as of the Closing Date.

"Closing Date Net Proceeds to Sellers" means an amount equal to the Per Share Consideration multiplied by the number of shares of Common Stock outstanding as of the Closing Date calculated in accordance with Exhibit 1.01(b).

"Code" means the Internal Revenue Code of 1986, as amended through the date hereof.

"Company Indebtedness" means, with respect to the Company and the Subsidiaries, as of the Closing, an amount equal to the sum, without duplication, of the following: (a) the Debt Obligations of the Company and the Subsidiaries, (b) any prepayment penalties, fees, make-whole amounts and similar debt, liabilities and obligations from early retirement of any Debt Obligation of the Company or any Subsidiary incurred in connection with the transactions contemplated by this Agreement, (c) any net debt, liabilities and obligations under any derivative financial instruments to which the Company or any Subsidiary is a party (including the Derivatives) and any debt, liabilities and obligations in connection with the termination of such instruments, (d) any unpaid costs incurred by the Company and the Subsidiaries in connection with the negotiation, execution or consummation of the transactions contemplated by this Agreement (including the unpaid fees and expenses of Banc of America Securities LLC, Chestnut Partners, Inc. and the Company's legal counsel referred to in Section 12.01), (e) the unpaid Legacy Costs and (f) the unpaid Capital Accumulation Plan Amount; it being agreed and acknowledged that Company Indebtedness shall not be reduced by any amounts paid by or on behalf of the Purchaser pursuant to this Agreement, including any such amounts paid by or on behalf of the Purchaser pursuant to Section 6.14 .

"Company Intellectual Property" means all Intellectual Property owned by the Company or a Subsidiary that is material to the operation of the Company and the Subsidiaries as currently conducted.

"Company IP Agreements" means all agreements concerning Intellectual Property to which the Company or the Subsidiaries are a party, including agreements granting the Company and the Subsidiaries rights to use the Licensed Intellectual Property, non-assertion agreements, settlement agreements, agreements granting rights to use Company Intellectual Property, trademark coexistence agreements and trademark consent agreements.

"Company's Knowledge", "Knowledge of the Company" or similar terms used in this Agreement mean the actual knowledge, after having made reasonable inquiry, of the Persons listed in Exhibit 1.01(c) as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement with respect to matters qualified by "Company's Knowledge" or the "Knowledge of the Company", as of the date of delivery of such certificate).

"Contract" means any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, letter of credit, franchise, commitment, undertaking or other instrument or arrangement, whether written or oral.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by Contract or otherwise.

"Conveyance Taxes" means sales, use, value added, transfer, stamp, stock transfer, real property transfer or gains and similar Taxes but does not include any income or franchise Taxes.

"Credit Facilities" means each of the agreements referred to in Exhibit 1.01(d).

"Current Leases" means (a) the Amended and Restated Net Lease, dated as of May 1, 1987, as amended October 17, 1997, between Arrowhead Partners as lessor and the Company as lessee for the Company research facility located at 4600 Arrowhead Drive, Ann Arbor, Michigan and (b) the Net Lease, dated as of October 17, 1997, between Arrowhead Group L.L.C. as lessor and the Company as lessee for the Company headquarters located at 4600 Arrowhead Drive, Ann Arbor, Michigan.

"Debt Obligations" means, with respect to the Company and the Subsidiaries, as of the Closing, an amount equal to the sum, without duplication, of the following: (a) all obligations of such Person for borrowed money other than intercompany indebtedness; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar debt instruments; (c) all capital lease obligations of such Person; (d) all guarantees by such Person of Debt Obligations of others, including, in the case of each of the above items, any accrued interest on such amounts; and (e) all obligations of such Person related to non-recourse factoring transactions. For the avoidance of doubt, Debt Obligations shall not include any amounts owing under an operating lease, the Current Leases, or any amounts subject to letters of credit that are payable only in the event of non-performance of the underlying obligation. The payment by the Purchaser on behalf of the Company and the Subsidiaries pursuant to Section 6.14 and the

resulting reduction in Debt Obligations shall be disregarded for purposes of calculating Debt Obligations.

"Disclosure Schedule" means the Disclosure Schedule, dated as of the date hereof, delivered by the Sellers to the Purchaser in connection with this Agreement. Notwithstanding anything to the contrary contained in the Disclosure Schedule or in this Agreement, the information and disclosures contained in any section of the Disclosure Schedule shall be deemed to be disclosed and incorporated by reference in any other section of the Disclosure Schedule as though fully set forth in such other section for which the applicability of such information and disclosure is reasonably apparent on the face of such information or disclosure without further investigation.

"EBITDA" means, at any date of determination, the sum, for the Company and its Subsidiaries taken as a whole, of (a) net income (or net loss) (determined without giving effect to any extraordinary gains or extraordinary losses), (b) interest expense, (c) income tax expense, (d) depreciation expense and (e) amortization expense, in each case determined in accordance with GAAP and calculated in accordance with Exhibit 1.01(e).

"EBUs" means Precisia LLC, Jetrion LLC, Progressive Color Media, LLC and Press Support Unlimited, a division of Flint Ink North America Corporation

"Encumbrance" means any security interest, pledge, hypothecation, mortgage, charge, easement, lien or encumbrance or restriction on transfer or any other exception to title of any kind, other than any licenses of Intellectual Property

"Environmental Law" means any federal, state, provincial, local or foreign statute, law (including common law), ordinance, regulation, rule, code, order, consent decree, judgment or legally binding requirement of any applicable Governmental Authority, relating to pollution or protection of the environment or health and safety, as such relates to Hazardous Materials, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Environmental Liability" means any Liability arising out of, relating to or resulting from any Environmental Law or environmental matter or condition, including natural resource damages or exposure to Hazardous Materials, and related in any way to the Assets or to this Agreement or its subject matter, in each case whether arising or incurred before, at or after the Closing.

"Environmental Permits" means any permit, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law.

"Equity Gain Share Amount" means any amounts payable or otherwise to become payable to the participants in the Equity Gain Share Plan as a result of the consummation of the transactions contemplated hereby or otherwise to become payable for periods prior to the consummation of the transactions contemplated hereby.

"Equity Gain Share Plan" means collectively (i) the Flint Ink Corporation Equity Gain Share Plan (as amended and restated August 13, 2004), as amended by Amendment No. 1 thereto, effective as of December 17, 2004 and Amendment No. 2 thereto, effective as of June 28, 2005 and (ii) the Flint Ink Corporation Director Equity Gain Share Plan (as amended and restated August 13, 2004), as amended by Amendment No. 1 thereto, effective as of June 28, 2005.

"Equity Gain Shares" means the Common Stock equivalents issued to participants under the Equity Gain Share Plan and outstanding as of the Closing Date excluding any supplemental grants made pursuant to the Equity Gain Share Plan on January 1, 2005.

"Equity Holders" means the Sellers and the holders of the Equity Gain Shares.

"Escrow Agent" means an escrow agent based in the City of New York to be selected by the Sellers promptly after the date hereof, subject to the Purchaser's approval (such approval not to be unreasonably withheld or delayed).

"Escrow Amount" means $100,000,000

"Escrow Fund" means the Escrow Amount deposited with the Escrow Agent, as such sum may be increased or decreased as provided hereunder or in the Escrow Agreement.

"EU Merger Regulation" means the requirements of the Council Regulation (EC) No. 139/2004 of January 20, 2004 of the European Union, as amended.

"Excluded Taxes" means liabilities, to the extent unpaid as of the Closing, for (a) Taxes imposed on, or payable by, the Company or any Subsidiary for any taxable period that ends on or before the Closing Date; (b) with respect to Straddle Periods, Taxes imposed on the Company or any Subsidiary which are allocable, pursuant to Section 8.01(b), to the portion of such period ending on the Closing Date; (c) Taxes attributable to a taxable period (or portion thereof) ending on or before the Closing Date for which the Company or any Subsidiary are held liable under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law) by reason of the Company or any Subsidiary being included in any consolidated, affiliated, combined or unitary group with the Sellers (or any Affiliates of the Sellers) at any time before the Closing Date; and (d) the Conveyance Taxes required to be paid by the Sellers pursuant to Section 8.06; provided, however, that Excluded Taxes shall not include Taxes (A) reflected in the Final Adjustment Statement; (B) resulting from any act, transaction or omission of the Purchaser, the Company or any Subsidiary occurring on the Closing Date, but after the Closing; (C) resulting from any Tax election made by the Purchaser or any of its Affiliates (including the Company and the Subsidiaries after the Closing Date) with respect to the transactions contemplated by this Agreement, including an actual or deemed election under Section 338 of the Code with respect to the transactions contemplated by this Agreement; or (D) that would not have been incurred but for the transactions contemplated by the European Acquisition Agreement, the Dutch Acquisition Agreement, the Danish Acquisition Agreement, the German I Acquisition Agreement and the German II Acquisition Agreement other than any Tax that is not a Conveyance Tax and is imposed on Flint-Schmidt JV as a result of the German II Acquisition to the extent that the amount of such Tax does not exceed the lowest amount of

Taxes, other than Conveyance Taxes, that would have been imposed on Flint-Schmidt JV if the Company or a Subsidiary (including Flint-Schmidt JV) had purchased, redeemed or cancelled the Families' interests in Flint-Schmidt JV for a price equal to such interests' deemed value on the Closing Date.

"Exclusivity Agreement" means the Exclusivity Agreement, dated as of May 13, 2005, among Aster 2 S.A., the Company, Susan E. Cooper, David B. Flint, H. Howard Flint II, Marilyn A. Flint and Ellen F. Price.

"Families" means members of the Schmidt or Kalden families listed on Schedule 1.01(a) of the Disclosure Schedule.

"Flint-Schmidt JV" means Flint-Schmidt GmbH & Co. KG.

"Fully Diluted Amount" means the sum of (a) the number of shares of Common Stock outstanding as of the Closing Date plus (b) the number of Equity Gain Shares.

"GAAP" means United States generally accepted accounting principles and practices in effect (i) at the date of the applicable financial statement or (ii) for purposes of Section 2.07, as of the Closing Date applied consistently throughout the periods involved.

"Governmental Authority" means any federal, foreign, national, supranational, state, provincial, local or other government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"Governmental Authorizations" means any license, permit, certificate, approval, consent, order, registration, variance, exemption or other authorization issued by or obtained from a Governmental Authority.

"Governmental Order" means any order, writ, judgment, injunction, subpoena, indictment, demand, decree, stipulation, determination or award entered by or with any Governmental Authority

"Guarantor" means Aster 2 S.A.

"Guarantor Guaranty" means the guaranty by the Guarantor, substantially in the form attached hereto as Annex VII.

"Hazardous Material" means any chemical, material or substance defined as toxic or hazardous or as a pollutant or contaminant under any Environmental Law, or any chemical, material or substance that is otherwise regulated under any Environmental Law

"Headquarters Lease Agreement" means an agreement to be entered into, immediately prior to the Closing, by and between Arrowhead Group L.L.C., as lessor, and the Company, as lessee, on substantially the same terms and conditions set forth in the Net Lease, dated as of October 17, 1997, between Arrowhead Group L.L.C. as lessor and the Company as lessee for the Company headquarters located at 4600 Arrowhead Drive, Ann Arbor, Michigan except that (a) the term shall be for the period of eighteen months from the Closing Date, (b) rent

for any portion of 2005 following the Closing shall be calculated pro rata, based upon the aggregate annual rent for 2005 for the Headquarters Lease Agreement and Research Facility Lease Agreement of $3,197,162 and rent for any subsequent calendar year or portion thereof shall be calculated based upon the aggregate annual rent for the previous year plus an amount equal to the greater of (i) 3% or (ii) the consumer price index for such year or portion thereof and (c) the modifications set forth in Exhibit 1.01(f) shall be made.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indemnified Party" means a Purchaser Indemnified Party or a Seller Indemnified Party, as the case may be.

"Indemnifying Party" means the Sellers for purposes of Section 10.02 and the Purchaser for purposes of Section 10.03, as the case may be.

"Independent Accounting Firm" means (a) Grant Thornton LLP (with the individual professionals assigned by the Managing Partner of such firm's office in New York, New York) or (b) an independent certified public accounting firm in the United States of national recognition (other than a firm which has a material relationship with the Sellers or the Purchaser or any of their respective Affiliates) mutually acceptable to the Sellers and the Purchaser.

"Intellectual Property" means (a) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues; (b) Trademarks; (c) copyrights in published and unpublished works of authorship and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof; (d) Trade Secrets and (e) all other intellectual property or similar proprietary rights.

"IRS" means the Internal Revenue Service of the United States.

"IT Assets" means the Company's and the Subsidiaries' computers, computer software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment, and all associated documentation.

"JV Amount" means an amount equal to $117,765,900.

"Law" means any federal, foreign, national, provincial, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Leased Real Property" means the real property leased, subleased or licensed by the Company or any Subsidiary, in each case, as tenant, together with, to the extent leased, subleased or licensed by the Company or any Subsidiary, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment

and items of personal property of the Company or any Subsidiary attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"Legacy Costs" means any liabilities of the Company or any Subsidiary for periods following the Closing related to (a) the Current Leases, (b) the employment arrangements between the Company and each of H. Howard Flint II and David B. Flint, (c) the plane owned by Arrowhead Leasing, L.L.C. and related maintenance and operating expenses, (d) the Black River Ranch located in the counties of Montmorency and Cheboygan in the state of Michigan, (e) Arrowhead Properties Corporation and Arrowhead Leasing, LLC and (f) any assets used by the Sellers for personal use and not primarily related to the day-to-day operation of the Business or agreements entered into with any Seller or any relative of any Seller or entity controlled by any such person or persons which agreement is less favorable to the Company or any of its Subsidiaries than would have been negotiated on arms-length terms.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, known or unknown, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any Contract.

"LIBOR" means the one-month Interbank Official Rate with respect to deposits in U.S. Dollars which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the Business Day immediately preceding the Closing Date and such one-month rate on the Business Day immediately preceding each monthly anniversary of the Closing Date with respect to interest due for any subsequent monthly period.

"Licensed Intellectual Property" means Intellectual Property that the Company and the Subsidiaries are licensed or otherwise permitted by other Persons to use.

"Material Adverse Effect" means any circumstance, fact, development, change in or effect on the Company and the Subsidiaries that (a) individually or in the aggregate, is or would reasonably be expected to be materially adverse to the Business, the Assets, the consolidated results of operations or the consolidated financial condition of the Company and the Subsidiaries, taken as a whole, (b) has resulted, or would reasonably be expected to result, in EBITDA of the Company and its Subsidiaries, taken as a whole, from January 1, 2005 through the Closing Date being less than $85.0595 million; provided, however, that any expense that would not reasonably be expected to have a recurring effect on EBITDA shall not be considered when determining whether there has been a Material Adverse Effect under this clause (b) or (c) does, or would reasonably be expected to, prevent or materially delay the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; provided, however, that none of the following, either alone or in combination, shall be considered in determining whether there has been a Material Adverse Effect or a breach of a representation, warranty, covenant or agreement that is qualified by the term "Material Adverse Effect": (a) events, circumstances, facts, developments, changes or effects resulting from the loss of employees or customers of the Business primarily arising from the consummation of the transactions contemplated by, or the announcement of the execution of, this Agreement, (b) any circumstance, fact, development, change or effect that results from any action required to be

taken or not taken pursuant to this Agreement or taken or not taken at the written request of the Purchaser.

"Net Debt" means, for the Company and the Subsidiaries, as of the Closing, the amount equal to (a) Company Indebtedness less (b) Cash.

"Ordinary Course of Business" means actions and omissions that are (a) taken or not taken, respectively, in the ordinary course of the normal, day-to-day operations of the Company and the Subsidiaries and (b) consistent with the past practices of the Company and the Subsidiaries

"Owned Real Property" means any real property in which the Company or any Subsidiary has fee title (or equivalent) interest, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Company or any Subsidiary attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing

"Per Share Consideration" means the amount equal to (a) the sum of the Closing Date Net Proceeds to Equity Holders plus the aggregate Base Price (as defined in the Equity Gain Share Plan) of the Equity Gain Shares divided by (b) the Fully Diluted Amount.

"Permitted Encumbrances" means (a) statutory liens for current Taxes not yet due or delinquent (or which may be paid without interest or penalties) or the validity or amount of which is being contested in good faith by appropriate proceedings, (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the Ordinary Course of Business relating to obligations as to which there is no default on the part of the Company or any Subsidiary, as the case may be, or the validity or amount of which is being contested in good faith by appropriate proceedings, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially detract from the value of the Real Property affected thereby for its present use or materially interfere with the present use of such Real Property, (d) all covenants, conditions, restrictions, easements, charges, rights-of-way, other Encumbrances and similar matters of record set forth in any state, local or municipal franchise of the Company and the Subsidiaries which do not materially detract from the value of the Real Property affected thereby for its present use or materially interfere with the present use of the Real Property affected thereby, (e) all easements or rights-of-way or similar Encumbrances imposed in connection with any public utility or utility service provider which do not materially detract from the value of the Real Property affected thereby for its present use or materially interfere with the present use of such Real Property and (f) matters which would be disclosed by an accurate survey of the Real Property, which do not materially detract from the value of such Real Property for its present use or materially impair the occupancy or present use of such Real Property which they encumber

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate

or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended

"Pre-Closing Transactions Consideration" means the sum of the purchase prices paid to the Company or its Subsidiaries pursuant to the Dutch Acquisition Agreement, the Danish Acquisition Agreement and the German I Acquisition Agreement.

"Profit Sharing Amount" means an amount equal to the sum of (a) the amounts accrued as of the Closing Date for 2005 under the Flint Ink Corporation Incentive Compensation Plan and all other incentive compensation plans or arrangements administered by any division or branch of the Company or any Subsidiary, (b) the amounts accrued as of the Closing Date with respect to the Company contributions for 2005 under the Flint Ink Corporation Profit-Sharing and Benefit Plan and (c) any payments that become due in respect of any supplemental grants made under the Equity Gain Share Plan; it being understood and agreed that (i) the accruals under (a) and (b) above shall be calculated in accordance with the plan documents and GAAP on a basis consistent with practices used in preparing the Audited Financial Statements and based on projections of full-year Company performance using actual year-to-date Company results as of the Closing Date and (ii) the accruals under (a) and (b) above shall be calculated without duplication of any item reflected in the calculation of Working Capital. The Profit Sharing Amount shall exclude, without limitation, all amounts payable under the Equity Gain Share Plan (except with respect to any supplemental grants as indicated above) and all amounts payable following the Closing Date under any severance or retention bonus arrangements that are conditioned upon the performance of services following the Closing Date.

"Purchase Price Bank Account" means a bank account in the United States to be designated by the Sellers' Representatives in a written notice to the Purchaser at least five Business Days before the Closing.

"Purchaser's Knowledge", "Knowledge of the Purchaser" or similar terms used in this Agreement mean the actual knowledge, after having made reasonable inquiry, of the Persons listed in Exhibit 1 01(f) as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement with respect to matters qualified by "Purchaser's Knowledge" or the "Knowledge of the Purchaser", as of the date of delivery of such certificate)

"Real Property" means all of the Owned Real Property and Leased Real Property.

"Reference Balance Sheet" means the unaudited consolidated balance sheet of the Company and the Subsidiaries as of May 31, 2005.

"Reference Balance Sheet Date" means May 31, 2005

"Reference Working Capital" means $230,000,000

"Registered" means issued by, registered with, renewed by or the subject of a pending application before, any Governmental Authority or Internet domain name registrar.

"Release" means any spill, emission, leaking, pumping, injection, deposit or discharge of any Hazardous Materials, in, onto or through the environment (including buildings, structures, air, surface water, groundwater or surface or subsurface soil).

"Remedial Action" means all action to (a) clean up, remove, treat or handle in any other way Hazardous Materials in the environment, (b) restore or reclaim the environment or natural resources, (c) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or the environment or (d) perform remedial investigations, feasibility studies, corrective actions, closures and postremedial or postclosure studies, investigations, operations, maintenance and monitoring on, about or in any property.

"Research Facility Lease Agreement" means an agreement to be entered into, on or immediately prior to the Closing, by and between Arrowhead Partners as lessor, and the Company as lessee, on substantially the same terms and conditions set forth in the Amended and Restated Net Lease, dated as of May 1, 1987, as amended October 17, 1997, between Arrowhead Partners as lessor and the Company as lessee, for the Company research facility located at 4600 Arrowhead Drive, Ann Arbor, Michigan, except that (a) the term shall be for the period of eighteen months from the Closing Date, (b) rent for any portion of 2005 following the Closing shall be calculated pro rata, based upon the aggregate annual rent for 2005 for the Research Facility Lease Agreement and the Headquarters Lease Agreement of $3,197,162 and rent for any subsequent calendar year or portion thereof shall be calculated based upon the aggregate annual rent for the previous year plus an amount equal to the greater of (i) 3% or (ii) the consumer price index for such year or portion thereof and (c) the modifications set forth on Exhibit 1.01(f) shall be made to the appropriate sections.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller Adjustment Amount" means an amount equal to the product of (a) the quotient of (i) the difference between the Closing Date Net Proceeds to Equity Holders and the Final Net Proceeds to Equity Holders divided by (ii) the Fully Diluted Amount multiplied by (b) the number of shares of Common Stock outstanding as of the Closing Date.

"Sellers' Percentage" means (a) the quotient of (i) the number of outstanding shares of Common Stock as of the Closing Date divided by (ii) the Fully Diluted Amount multiplied by (b) 100 and rounded to the nearest hundredth.

"Shareholder Loan Amount" means an amount equal to the aggregate amounts outstanding under the Shareholder Loans, including any interest accrued thereon, as of the Closing.

"Shareholder Loans" means the loans to the Sellers set forth on Section 1.01(c) of the Disclosure Schedule granted by the Company or any Subsidiary.

"Solvent" means, with respect to any Person and a specified date of determination, that at such date: (i) the present fair saleable value of such Person's assets is in excess of the total amount of such Person's probable liabilities on its existing debts and obligations (including contingent liabilities) as they become absolute and matured; (ii) such

Person is able to pay its debts as they become due; and (iii) such Person does not have unreasonably small capital to carry on such Person's business as theretofore operated and all businesses in which such Person is then about to engage.

"Specified Properties" means each of the parcels of Owned Real Property located in the United States, Canada and Mexico.

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" means any Person of which the Company (A) owns, directly or indirectly, (i) 50% or more of the outstanding common stock or other interests, the holders of which are entitled to vote for the election of the board of directors or other governing body of such Person or (ii) outstanding common stock or other interests having the power to elect a majority of such Person's board of directors or other governing body, or (B) has otherwise the power to direct the business and policies of that Person.

"Tax" or "Taxes" means any and all taxes of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any taxing authority.

"Tax Returns" means any and all returns, reports and forms (including elections, declarations, amendments, schedules, information returns or attachments thereto) required to be filed with a taxing authority with respect to Taxes.

"Trade Secrets" means confidential and proprietary information, trade secrets and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists, supplier lists, databases and other compilations of information.

"Trademarks" means trademarks, service marks, trade names, trade dress and domain names, and other indicia of origin, all applications and registrations for the foregoing, together with the goodwill associated exclusively therewith, including all renewals of same.

"Working Capital" means, for the Company and the Subsidiaries (other than the EBUs), as of the Closing, all "accounts receivable (less allowances for doubtful accounts)" and "inventories" less "accounts payable" and "accrued expenses" in each case determined in accordance with GAAP and, to the extent not inconsistent with GAAP, the Accounting Principles, and applied on a basis consistent with past practices used in preparing the Audited Financial Statements; it being agreed that for all purposes hereunder Working Capital shall in no event be an amount greater than $260,000,000. For the purposes of calculating Working Capital, all Assets and Liabilities either related to Taxes or the Legacy Costs or included in Company Indebtedness shall be excluded.

SECTION 1.02  Definitions. The following terms have the meanings set forth in the Sections set forth below:

| Definition | Location |
| --- | --- |

| Definition | Location |
|---|---|
| "Accounts Receivable" | 4.25 |
| "Acquisition Proposal" | 6.13(a) |
| "Agreement" | Preamble |
| "AHS Spain S L." | Recitals |
| "Audited Financial Statements" | 4.05(a) |
| "AZB" | Recitals |
| "Business" | Recitals |
| "Buy-Sell Agreement" | 6.13 |
| "Closing" | 2.03 |
| "Closing Date" | 2.03 |
| "Closing Date Excluded Taxes" | 2.06(b) |
| "Closing Date Net Debt" | 2.06(b) |
| "Closing Date Net Proceeds to Equity Holders" | 2.07(a) |
| "Closing Date Profit Sharing Amount" | 2.07(b) |
| "Closing Date Shareholder Loan Amount" | 2.07(b) |
| "Closing Date Working Capital" | 2.07(b) |
| "Commission" | 6.04(d) |
| "Common Stock" | Recitals |
| "Company" | Recitals |
| "Competing Business" | 6.10(a) |
| "Confidentiality Agreement" | 6.03(a) |
| "Contest" | 8.03(b) |
| "Danish Acquisition Agreement" | Recitals |
| "Derivatives" | 4.17 |
| "DISC Commission" | 6.11(c) |
| "Dutch Acquisition Agreement" | Recitals |
| "Employee" | 7.01(a) |
| "ERISA" | 4.13(a) |
| "ERISA Affiliate" | 4.13(e) |
| "Escrow Agreement" | 2.08 |
| "Estimated Closing Statement" | 2.07(a) |
| "Estimated Excluded Taxes" | 2.07(a) |
| "Estimated Net Debt" | 2.07(a) |
| "Estimated Profit Sharing Amount" | 2.07(a) |
| "Estimated Shareholder Loan Amount" | 2.07(a) |
| "Estimated Working Capital" | 2.07(a) |
| "European Acquisition Agreement" | Recitals |
| "Final Net Proceeds to Equity Holders" | 2.07(e) |
| "Financial Statements" | 4.05(a) |
| "Financing Letters" | 5.05 |
| "Flint Ink UK" | Recitals |
| "Foreign Governmental Plan" | 4.13(j) |
| "Foreign Plan" | 4.13(j) |
| "German I Acquisition Agreement" | Recitals |

| Definition | Location |
|---|---|
| "German II Acquisition Agreement" | Recitals |
| "Guarantor Balance Sheet" | 5.05(c) |
| "Initial Adjustment Statement" | 2.07(b) |
| "Insurance Policies" | 4.21 |
| "Interim Financial Statements" | 4.05(a) |
| "ISRA" | 4.04 |
| "Losses" | 10.02 |
| "Material Contracts" | 4.15(a) |
| "Most Cost Effective Manner" | 10.08(c) |
| "Multiemployer Plan" | 4.13(b) |
| "Notice of Disagreement" | 2.07(c) |
| "PBGC" | 4.13(e) |
| "Pension Plan" | 4.13(c) |
| "Plans" | 4.13(a) |
| "Products" | 4.24 |
| "Purchase Price" | 2.02 |
| "Purchaser" | Preamble |
| "Purchaser Benefit Plans" | 7.01(d) |
| "Purchaser Indemnified Party" | 10.02 |
| "Seller Indemnified Party" | 10.03 |
| "Sellers" | Preamble |
| "Sellers' Representatives" | 2.09 |
| "Senior Facilities Agreement" | 5.05(a) |
| "Shares" | Recitals |
| "Significant Customer" | 4.23(b) |
| "Significant Supplier" | 4.23(a) |
| "Specified Losses" | 10.04(b)(vii) |
| "Straddle Period Contest" | 8.03(b) |
| "Termination Date" | 11.01(a) |
| "Third Party Claim" | 10.05(b) |
| "Title Company" | 6.09(b) |
| "waiving party" | 10.04(b)(vi) |

SECTION 1.03. Interpretation and Rules of Construction. In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(a)     when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated;

(b)     the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include", "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)    references to a Person are also to its successors and permitted assigns;

(h)    references to materiality mean material to the Business as a whole; and

(i)    the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01. <u>Purchase and Sale of the Shares</u>. Upon the terms and subject to the conditions of this Agreement, at the Closing, the Sellers shall sell to the Purchaser the Shares free and clear of all Encumbrances, and the Purchaser shall purchase the Shares.

SECTION 2.02. <u>Purchase Price</u>. Subject to the adjustments set forth in Section 2.07, the purchase price for the Shares shall be the Base Amount less the JV Amount (the "<u>Purchase Price</u>").

SECTION 2.03. <u>Closing</u>. Subject to the terms and conditions of this Agreement, the sale and purchase of the Shares contemplated by this Agreement shall take place at a closing (the "<u>Closing</u>") to be held at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, New York at 10:00 a.m. New York time on October 3, 2005 (provided that all of the conditions to the obligations of the parties hereto set forth in Section 9.01 and Section 9.02 (other than those conditions that by their nature are to be satisfied at Closing) have been satisfied or waived at least 15 Business Days prior to such date) or at such other place or at such other time or on such other date as the Sellers and the Purchaser may mutually agree upon in writing (the "<u>Closing Date</u>")

SECTION 2.04. <u>Closing Deliveries by the Sellers</u>. At the Closing, the Sellers shall deliver or cause to be delivered to the Purchaser:

(a)    stock certificates evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank;

(b)    executed counterparts of each Ancillary Agreement to which the Sellers or an Affiliate of the Sellers are party;

(c)    the resignations (including copies of any shareholder or other applicable resolutions relating to such resignations) effective as of the Closing, of (i) all directors of the Company, (ii) all directors of the Subsidiaries who are also Sellers, (iii) all officers of the Company or any Subsidiary who are also Sellers, and (iv) those directors of the Subsidiaries designated in writing by the Purchaser no less than 10 Business Days prior to the Closing, and, if necessary or requested, upon the provision of all necessary information with respect to any prospective directors, use its reasonable best efforts to cause the appointment, effective as of the Closing, of replacement directors to the extent designated in writing by the Purchaser 10 Business Days prior to the Closing;

(d)    the Books and Records and Tax Returns and other Tax records (which shall be deemed delivered by the Sellers to the Purchaser by the presence of such Books and Records and Tax Returns and other Tax records at the applicable offices of, or offsite facilities used by, the Company and the Subsidiaries);

(e)    a certificate of good standing of the Company, as of a date no more than five Business Days prior to the Closing Date, from the Secretary of State of the State of Michigan;

(f)    a receipt for the Closing Date Net Proceeds to Sellers less the Escrow Amount;

(g)    a certificate of the Sellers' Representatives certifying as to the matters set forth in Section 9 02(a);

(h)    evidence of the termination, effective as of the Closing, of the Encumbrances described in Section 6.14 hereof and the Derivatives; and

(i)    such other instruments or documents as the Purchaser may reasonably request from the Sellers, as may be required to give effect to this Agreement, the Ancillary Agreements and the financing by the Purchaser of the transactions contemplated hereby.

SECTION 2.05.  Closing Deliveries by the Purchaser   (a)  At the Closing, the Purchaser shall deliver to the Sellers:

(i)    the Closing Date Net Proceeds to Sellers less the Escrow Amount by wire transfer in immediately available funds to the Purchase Price Bank Account;

(ii)    executed counterparts of each Ancillary Agreement to which the Purchaser or an Affiliate of the Purchaser is a party;

(iii)    a certificate of a duly authorized officer of the Purchaser certifying as to the matters set forth in Section 9 01(a); and

(iv)    such other instruments or documents as the Sellers may reasonably request from the Purchaser, as may be required to give effect to this Agreement and the Ancillary Agreements.

(b)    At the Closing, the Purchaser shall deliver to the Escrow Agent, in accordance with the Escrow Agreement, the Escrow Amount by wire transfer in immediately available funds to the account designated therefor in the Escrow Agreement.

SECTION 2.06.  Equity Gain Share Plan.  At the Closing, the Purchasers shall fund the Company with the Closing Date Net Proceeds to EGS Holders and the Sellers shall cause the Company to pay to each holder of Equity Gain Shares such holder's portion of the Equity Gain Share Amount pursuant to the terms of the Equity Gain Share Plan; provided, however, that any payments to such holder shall be reduced by the Holdback Amount (as defined in the Equity Gain Share Plan); and provided, further, that any payments to such holder shall be net of any applicable withholding Taxes (which, for the avoidance of doubt, includes social security Tax withholding).  Any amounts withheld pursuant to this Section 2.06 shall be treated as having been paid to the applicable holder for all purposes of this Agreement and the Equity Gain Share Plan.

SECTION 2.07.  Purchase Price Adjustment.  (a)  No less than seven Business Days nor more than ten Business Days prior to the Closing Date, the Sellers' Representatives shall deliver to the Purchaser a certificate duly executed by the Chief Financial Officer of the Company (the "Estimated Closing Statement") setting forth (i) the Sellers' good faith estimate of the Profit Sharing Amount (the "Estimated Profit Sharing Amount") (ii) the Sellers' good faith estimate of Net Debt (the "Estimated Net Debt"), (iii) the Sellers' good faith estimate of Working Capital (the "Estimated Working Capital"), (iv) the Sellers' good faith estimate of accrued current Excluded Taxes as of the Closing (which shall be determined consistent with the methodology set forth in Section 8.01(b)(i), (ii) and (iii) and without regard to clause (A) of the proviso to the definition of "Excluded Taxes") (the "Estimated Excluded Taxes"), (v) the number of Equity Gain Shares and shares of Common Stock outstanding as of the Closing, (vi) the Equity Gain Share Amount and (vi) the Sellers' good faith estimate of the Shareholder Loan Amount (the "Estimated Shareholder Loan Amount"), each in such form and with such information as is reasonably acceptable to the Purchaser.  An adjustment to the Purchase Price shall be made as follows (such amount adjusted in accordance with this Section 2.07(a) being the "Closing Date Net Proceeds to Equity Holders"):

(i)    in the event that the Estimated Net Debt is greater than zero (i.e., Cash is less than Company Indebtedness), the Purchase Price shall be decreased by the amount of the Estimated Net Debt;

(ii)    in the event that the Estimated Net Debt is less than zero (i.e., Cash is greater than Company Indebtedness), the Purchase Price shall be increased by the absolute value of the Estimated Net Debt;

(iii)    in the event that the Estimated Working Capital is less than the Reference Working Capital, the Purchase Price shall be reduced by the amount of such deficit;

(iv)     in the event that the Estimated Working Capital is greater than the Reference Working Capital, the Purchase Price shall be increased by the amount of such surplus;

(v)     the Purchase Price shall be reduced by the amount of the Estimated Profit Sharing Amount;

(vi)     the Purchase Price shall be reduced by the amount of the Estimated Excluded Taxes; and

(vii)     the Purchase Price shall be reduced by the amount of the Estimated Shareholder Loan Amount.

(b)     No later than 75 days after the Closing Date, the Purchaser shall prepare and deliver to the Sellers' Representatives a statement setting forth the Purchaser's determination of (i) Net Debt ("Closing Date Net Debt"), (ii) Working Capital (the "Closing Date Working Capital"), (iii) accrued current Excluded Taxes as of the Closing (which shall be determined consistent with the methodology set forth in Section 8.01(b)(i), (ii) and (iii) and without regard to clause (A) of the proviso to the definition of "Excluded Taxes") ("Closing Date Excluded Taxes"), (iv) the Profit Sharing Amount ("Closing Date Profit Sharing Amount"), and (v) the Shareholder Loan Amount ("Closing Date Shareholder Loan Amount"), in each case certified by a senior financial officer of the Company (the "Initial Adjustment Statement"). At all reasonable times during the 75 days immediately following the Sellers' Representatives' receipt of the Initial Adjustment Statement, the Sellers, the Sellers' Representatives and their representatives shall be permitted to review the records of the Company, the Subsidiaries and their respective accountants, in each case relating to the Initial Adjustment Statement, and the Purchaser shall make reasonably available the individuals responsible for the preparation of the Initial Adjustment Statement in order to respond to the reasonable inquiries of the Sellers and the Sellers' Representatives related thereto.

(c)     The Sellers' Representatives shall notify the Purchaser in writing (the "Notice of Disagreement") within 75 days after receiving the Initial Adjustment Statement if the Sellers' Representatives disagree with any amounts reflected on the Initial Adjustment Statement. The Notice of Disagreement shall set forth in reasonable detail the reason for such dispute, the dollar amounts involved and the Sellers' Representatives' good faith estimate of the Closing Date Working Capital, the Closing Date Net Debt, the Closing Date Excluded Taxes, the Closing Date Profit Sharing Amount and the Closing Date Shareholder Loan Amount. If the Sellers' Representatives do not deliver a Notice of Disagreement to the Purchaser within such 75-day period or if the Sellers' Representatives at any time during such 75-day period notify the Purchaser in writing that the Sellers do not disagree with any amounts reflected on the Initial Adjustment Statement, then the Initial Adjustment Statement shall be deemed to have been accepted by the Sellers, shall become final and binding upon the parties hereto and shall be deemed the Final Adjustment Statement upon the earlier of the expiration of such 75-day period and the Purchaser's receipt of such written notice. If the Sellers' Representatives do deliver a Notice of Disagreement to the Purchaser, only those matters that are specified in such Notice of Disagreement shall be deemed to be in dispute, and all other matters shall be final and binding upon the parties hereto.

(d)     During the 30 days immediately following the delivery of a Notice of Disagreement, the Sellers' Representatives and the Purchaser shall seek to resolve any differences that they may have with respect to any matter specified in the Notice of Disagreement, and any resolution by them as to any such matter shall be final and binding on the parties hereto. If at the end of such 30-day period the Sellers' Representatives and the Purchaser have been unable to agree upon all matters specified in the Notice of Disagreement, then either the Sellers' Representatives or the Purchaser may submit to the Independent Accounting Firm for review and resolution any and all matters specified in the Notice of Disagreement that remain in dispute. The Purchaser and the Sellers' Representatives shall cause the Independent Accounting Firm to make a final determination (which determination shall be binding on the parties hereto) of the Closing Date Working Capital, the Closing Date Net Debt, the Closing Date Profit Sharing Amount, the Closing Date Excluded Taxes and the Closing Date Shareholder Loan Amount within 45 days from such submission, and such final determination shall be deemed the Final Adjustment Statement. The Purchaser shall bear half the cost of the Independent Accounting Firm's review and determination, and the remaining half of such cost shall be borne by the Sellers in accordance with each Seller's Applicable Percentage. During the 45-day review by the Independent Accounting Firm, the Purchaser, Sellers and the Sellers' Representatives shall each make available, and the Purchaser shall cause the Company and the Subsidiaries to make available, to the Independent Accounting Firm such individuals and such information, books and records as may be reasonably required by the Independent Accounting Firm to make its final determination.

(e)     Within five Business Days after the Final Adjustment Statement becomes or is deemed final and binding on the parties hereto, the Closing Date Net Proceeds to Equity Holders shall be adjusted as follows (such amount adjusted in accordance with this Section 2.07(e) being the "Final Net Proceeds to Equity Holders"):

(i)     in the event that the Estimated Working Capital exceeds the Closing Date Working Capital (as set forth in the Final Adjustment Statement), then the Closing Date Net Proceeds to Equity Holders shall be adjusted downward in an amount equal to such excess;

(ii)     in the event that the Closing Date Working Capital (as set forth in the Final Adjustment Statement) exceeds the Estimated Working Capital, then the Closing Date Net Proceeds to Equity Holders shall be adjusted upward in an amount equal to such excess;

(iii)     in the event that the Estimated Net Debt exceeds the Closing Date Net Debt (as set forth in the Final Adjustment Statement), then the Closing Date Net Proceeds to Equity Holders shall be adjusted upward in an amount equal to such excess;

(iv)     in the event that the Closing Date Net Debt (as set forth in the Final Adjustment Statement) exceeds the Estimated Net Debt, then the Closing Date Net Proceeds to Equity Holders shall be adjusted downward in an amount equal to such excess;

(v)     in the event that the Closing Date Excluded Taxes (as set forth in the Final Adjustment Statement) exceeds the Estimated Excluded Taxes, then the Closing Date Net Proceeds to Equity Holders shall be adjusted downward in an amount equal to such excess;

(vi)     in the event that the Estimated Excluded Taxes exceeds the Closing Date Excluded Taxes (as set forth in the Final Adjustment Statement), then the Closing Date Net Proceeds to Equity Holders shall be adjusted upward in an amount equal to such excess;

(vii)     in the event that the Closing Date Profit Sharing Amount (as set forth in the Final Adjustment Statement) exceeds the Estimated Profit Sharing Amount, then the Closing Date Net Proceeds to Equity Holders shall be adjusted downward in an amount equal to such excess;

(viii)     in the event that the Estimated Profit Sharing Amount exceeds the Closing Date Profit Sharing Amount (as set forth in the Final Adjustment Statement), then the Closing Date Net Proceeds to Equity Holders shall be adjusted upward in an amount equal to such excess;

(ix)     in the event that the Closing Date Shareholder Loan Amount (as set forth in the Final Adjustment Statement) exceeds the Estimated Shareholder Loan Amount, then the Closing Date Net Proceeds to Equity Holders shall be adjusted downward in an amount equal to such excess; and

(x)     in the event that the Estimated Shareholder Loan Amount exceeds the Closing Date Shareholder Loan Amount (as set forth in the Final Adjustment Statement), then the Closing Date Net Proceeds to Equity Holders shall be adjusted upward in an amount equal to such excess.

(f)     All adjustments set forth in Section 2.07(e) shall be netted against each other. If the Final Net Proceeds to Equity Holders exceed the Closing Date Net Proceeds to Equity Holders, the Purchaser shall pay the Seller Adjustment Amount to the Sellers within five Business Days of the final determination pursuant to Section 2.07(e) by wire transfer in immediately available funds to the Purchase Price Bank Account. If the Closing Date Net Proceeds to Equity Holders exceed the Final Net Proceeds to Equity Holders, the Purchaser and the Sellers shall cause the Escrow Agent to release the Seller Adjustment Amount to the Purchaser by wire transfer in immediately available funds to a bank account in the United States designated by the Purchaser to the Escrow Agent at least five Business Days in advance; provided, however, that in the event that the Seller Adjustment Amount to be received by the Purchaser exceeds $30,000,000, the Escrow Agent shall release the Seller Adjustment Amount from the Escrow Fund to the Purchaser and the Sellers shall pay any amount of such excess to the Escrow Agent within five Business Days of the final determination pursuant to Section 2.07(e) by wire transfer in immediately available funds as an addition to the Escrow Fund.

(g)     The Purchaser agrees that following the Closing through the date on which payment, if any, is made by either party pursuant to Section 2.07(f) or if the Final Adjustment

Statement indicates that no such payment is required, then through the date on which the Final Adjustment Statement becomes effective, it will not take any actions with respect to any accounting books, records, policies or procedures on which the Initial Adjustment Statement or the Final Adjustment Statement is to be based that would make it impossible or impracticable to calculate the Closing Date Working Capital, the Closing Date Net Debt, the Closing Date Excluded Taxes, the Closing Date Profit Sharing Amount and the Closing Date Shareholder Loan Amount in the manner and utilizing the methods required hereby.

      (h)     Any payments required to be made by the Sellers or the Purchaser pursuant to Section 2.07(f) shall bear interest from the Closing Date through the date of payment at LIBOR.

      SECTION 2.08  Escrow. Prior to the Closing, the Sellers' Representatives and the Purchaser shall enter into an escrow agreement with the Escrow Agent substantially in the form of Exhibit 2.08 hereto (the "Escrow Agreement"). In accordance with the terms of the Escrow Agreement, the Purchaser shall deposit the Escrow Amount to be managed and paid out by the Escrow Agent in accordance with the terms of the Escrow Agreement and the following:

      (a)     On the first anniversary of the Closing Date, the Escrow Agent shall release to the Sellers' Representatives an amount from the Escrow Fund equal to the amount, if any, by which the balance in the Escrow Fund at such time, less the full amount of any pending claims against the Escrow Fund made by the Purchaser, exceeds $70,000,000

      (b)     On the second anniversary of the Closing Date, the Escrow Agent shall release to the Sellers' Representatives an amount from the Escrow Fund equal to the amount, if any, by which the balance in the Escrow Fund at such time, less the full amount of any pending claims against the Escrow Fund made by the Purchaser, exceeds $30,000,000.

      (c)     On the third anniversary of the Closing Date, the Escrow Agent shall release to the Sellers' Representatives an amount equal to the remaining balance in the Escrow Fund less the full amount of any pending claims against the Escrow Fund made by the Purchaser

      SECTION 2.09.  Sellers' Representatives.  The Sellers have designated Susan E. Cooper, David B. Flint, Marilyn A. Flint, Mary F. Pardi and Ellen F. Price as their representatives (the "Sellers' Representatives") and as their attorneys-in-fact and agents with respect to the taking by such Sellers' Representatives of any and all actions, the receipt and delivery of notices and the making of all decisions, in each case required or permitted to be taken by the Sellers' Representatives in accordance with this Agreement and as otherwise authorized by the Sellers. The Purchaser shall be entitled to rely on any and all action taken by three of the Sellers' Representatives without any liability to, or obligation to inquire of, any Seller. The Purchaser is expressly authorized to rely on the genuineness of the signatures of the Sellers' Representatives and, upon receipt of any writing that reasonably appears to have been signed by three of the Sellers' Representatives, may act upon the same without any further duty of inquiry

as to the genuineness of the writing. Three of the Sellers' Representatives shall notify the Purchaser in accordance with Section 12.02 of the replacement of any Sellers' Representative.

ARTICLE III

REPRESENTATIONS AND WARRANTIES
OF THE SELLERS

Each Seller, severally and not jointly (except to the extent provided in Article X hereof), hereby represents and warrants to the Purchaser, as of the date hereof and as of the Closing Date or, if a representation or warranty is made as of a specified date, as of such date, subject to such information as is disclosed in the Disclosure Schedule, as follows:

SECTION 3.01.  Organization and Authority of the Sellers  (a)  To the extent that such Seller is not a natural person: (i) such Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary power and authority to enter into this Agreement, the Buy-Sell Agreement Letter and any Ancillary Agreements to which such Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; (ii) the execution and delivery of this Agreement, the Buy-Sell Agreement Letter and the Ancillary Agreements by such Seller, the performance by such Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby, to the extent applicable, have been duly authorized by all requisite action on the part of such Seller; (iii) this Agreement and the Buy-Sell Agreement Letter has been, and upon their execution the Ancillary Agreements shall have been, duly executed and delivered by such Seller; and (iv) (assuming due authorization, execution and delivery by the other parties thereto) this Agreement and the Buy-Sell Agreement Letter constitute, and upon their execution the Ancillary Agreements shall constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms.

(b)     To the extent that such Seller is a natural person: (i) such Seller has all necessary power and authority to enter into this Agreement, the Buy-Sell Agreement Letter and any Ancillary Agreements to which such Seller is a party, to carry out his or her obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; (ii) this Agreement and the Buy-Sell Agreement Letter has been, and upon their execution the Ancillary Agreements shall have been, duly executed and delivered by such Seller; and (iii) (assuming due authorization, execution and delivery by the other parties thereto) this Agreement and the Buy-Sell Agreement Letter constitute, and upon their execution the Ancillary Agreements shall constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms.

SECTION 3.02.  Governmental Consents and Approvals  The execution, delivery and performance of this Agreement and each Ancillary Agreement by such Seller do not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority, except (a) as described in Section 4.04 or (b) as may be necessary solely as a result of the nature of the business of the Purchaser (rather than that of the Company and its Affiliates) or ownership of the Purchaser or any of its Affiliates